IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN GAZDACKO,       ) Civil Action No. 2:21-cv-776
             )
       Plaintiff,  )
             )
             ) Judge:  Dodge
      vs.     )
             )
UNITED STATES OF AMERICA ,  )
DEPARTMENT OF VETERANS   )
AFFAIRS         )
             )
Serve:  Secretary of     )
   Veterans Affairs    )
   The Honorable    )
   Denis Richard McDonough )
   810 Vermont Avenue, NW )
   Washington , DC  20420  )
             )
   Attorney General    )
   Merrick B. Garland   )
   U.S. Department of Justice  )
   950 Pennsylvania Avenue, NW )
   Washington, DC  20530-0001 )
             )
   US Attorney for the Western )
   District of PA     )
   Stephen K. Kaufman   )
   United States Post Office and )
   Courthouse      )
   700 Grant Street, Suite 4000 )
   Pittsburgh, PA  15219   )
             )
             )
       Defendant. )
             )

**<u>PLAINTIFFS' COMPLAINT IN CIVIL ACTION WITH
ATTACHED CERTIFICATE OF MERIT</u>**

AND NOW, comes the Plaintiff, JOHN GAZDACKO, by and through his attorney, MICHAEL C. GEORGE, ESQUIRE, and sue the Defendant, UNITED STATES OF AMERICA, of which a following is a statement:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to Federal Tort Claims Act,  28 U.S.C. §2671-2680.  Jurisdiction is founded on 28 U.S.C. §1346(b)(1).  The acts more fully described below occurred within Allegheny County, Pennsylvania and are therefore within the jurisdiction of the United States District Court for the Western District of Pennsylvania.

2.      All conditions precedent pursuant to the Federal Tort Claims Act have been satisfied prior to the filing of this lawsuit.  Specifically, a Form 95 was timely served on behalf of Plaintiff, on or about November 25, 2019, with the appropriate federal agency, Office of General Counsel and Regional Counsel of the VA Healthcare System, 1010 Delafield Road, Pittsburgh, PA  15215 (See Form 95 on behalf of Plaintiff, John Gazdacko, attached as Exhibit "A", Form 95).

3.      On or about December 18, 2020 Defendant, United States of America, acting through the U.S. Department of Veterans Affairs, provided their denial letter. (See letter dated December 18, 2020 attached as Exhibit "B").

4.      Venue is proper in this Court because the wrongful acts complained of herein and the resulting claims of Plaintiffs against this Defendant herein arose in the City of Pittsburgh, County of Allegheny, Commonwealth of Pennsylvania, located within the venue of the United States District Court for the Western District of Pennsylvania.

## PARTIES

5.      Plaintiff, John Gazdacko (hereinafter referred to as "Plaintiff" or "Patient") is an adult individual and is a resident of the Commonwealth of Pennsylvania and resides at 420 Plum Avenue, New Kensington, Pennsylvania 15068.

6.      At all times pertinent to this matter, Defendant, United States of America, owned and operated inpatient hospital, medical and surgical facilities at the Department of Veterans Affairs, Pittsburgh VA Medical Center – University Drive, (also known as and hereinafter referred to as "VA Hospital Pittsburgh" and/or "VA Pittsburgh"), with a principal address of University Drive C, Pittsburgh, Allegheny County, Pennsylvania 15240-1003. The Defendant United States also maintains another Department of Veterans Affairs medical facility known as the HJ Heinz, III, Department of Veterans Affairs Medical Center (hereinafter referred to as "VA Heinz") located at 1010 Delafield Road, Pittsburgh, PA  15240-1003.  Plaintiffs are asserting a professional liability claim against this Defendant.

7.      At all times pertinent to this matter, Defendant, United States of America, administered medical and surgical treatment to Plaintiff, John Gazdacko, by and through various physicians, residents, interns, specialists, nurses and other personnel that Defendant, United States of America, engaged on the staff of the VA Pittsburgh and VA Heinz as its agents, servants, employees, deemed federal employees and ostensible agents, acting within the course and scope of that relationship with the Defendant, including, *inter alia,* Monica Rechichar, O.D., Elaina Swan, DNP, CRNP,

Shannon Hughes, R.N., Nicholas Tesla, O.D., Shreya Subramaniam, M.D., Alexandra

Clark, M.D. and multiple other physicians, CRNP's and other RN's at the VA Pittsburgh.

8.      At all times pertinent to this matter, Defendant, United States of America,

by and through its agents, servants, employees, deemed federal employees and

ostensible agents at or with the VA Pittsburgh and/or VA Heinz as aforesaid, held

themselves out to Plaintiff and to all other veterans seeking medical and surgical care

as physicians and/or technicians engaged in the specialties of optometry,

ophthalmology, endocrinology and primary care medicine and further represented or

held themselves out to possess the requisite degree of care, skill and knowledge

exercised and/or possessed by others of these professions and specialties in United

States and/or more particularly, in Allegheny County, Pennsylvania.  Additionally, at all

times pertinent to this matter, Defendant, United States of America, had actual and/or

constructive timely notice of the actions, errors and/or omissions of its agents, servants,

employees, deemed federal employees and ostensible agents, including, *inter alia*,

Monica Rechichar, O.D., Elaina Swan, DNP, CRNP, Shannon Hughes, R.N., Nicholas

Tesla, O.D., Shreya Subramaniam, M.D., Alexandra Clark, M.D., and other multiple

physicians, DNP's, CRNP's and other RN's at the VA Pittsburgh and VA Heinz.

9.      At all times pertinent to this matter, Plaintiff, John Gazdacko, was a

veteran of the United States Navy having served honorably from October 1961 until

February 1966.

## AVERMENTS OF FACT

10.      The facts of this matter may be briefly summarized as follows:

(a) On or about 2017, Plaintiff, John Gazdacko, was treating at the Veteran's Administration Hospital of Pittsburgh for multiple medical conditions including: chronic obstructive pulmonary disease (COPD), chronic pain syndrome, hypertension, hyperlipidemia and gastroesophageal reflux disease.

(b) On or about 2017, Plaintiff was diagnosed by VA physicians with Graves' Disease.   Graves' Disease is an autoimmune disorder that affects the thyroid.  It frequently results in and is the most common cause of hyperthyroidism.  Signs and symptoms and hyperthyroidism may include, *inter alia,* cardiac rhythm dysfunction, gastrointestinal distress, weight loss, muscle weakness and mood swings. Additionally, Graves' Disease frequently presents with, *inter alia,* ocular and vision symptoms that may include inflammation of the eyes, swelling of the tissues and muscles around the eyes and bulging of the eyes with resultant diminution of visual activity called Graves' ophthalmopathy or orbitopathy.

(c) Untreated and/or untimely treated Graves' ophthalmopathy/orbitopathy can lead to severe visual disturbance and dysfunction including diplopia, diminished visual acuity and blindness.

(d) Graves' ophthalmopathy/orbitopathy is appropriately managed by physicians within the specialty of ophthalmology.  Optometrists do not possess the education, training and experience to appropriately manage Graves' ophthalmopathy/orbitopathy and it is a departure of

the standard of care for any medical institution, including, *inter alia* the VA Pittsburgh and/or the VA Heinz, to allow optometrists to manage a patient with a diagnosis of Graves' ophthalmopathy/orbitopathy.

(e) On or about July, 2017, Plaintiff was seen by the endocrinology physicians at the VA for treatment of the previously diagnosed Graves' disease.  On that day, he was seen by an endocrinology fellow, Shreya Subramaniam, M.D.  Dr. Subramaniam's progress notes from that visit noted a clear diagnosis of Graves' disease in the patient's electronic health record (EHR) with the Defendant.  However, it does not appear that this particular diagnosis made its way into the system-wide VA hospital/VA Heinz EHR chart for the patient's past medical history/current complaints.  So while Dr. Subramaniam's diagnosis of Graves' disease is clearly reflected in the endocrinology progress note in the Defendant's EHR chart, the diagnosis of Graves' disease was somehow not documented into the system-wide EHR that would be seen by other physicians and healthcare providers attending to the patient.

(f) Of note, in the July 31, 2017, endocrinology progress note by Dr. Subramaniam reflected that the patient was not complaining of any "vision abnormalities or protrusion of the eyes or gritty sensation in the eyes".

(g) On or about September 28, 2018, a little more than a year after Plaintiff's visit with the endocrinology fellow, Dr. Subramaniam, Plaintiff

was seen by a VA optometrist, Nicholas Tesla.  In that visit with Dr.

Tesla, Plaintiff made clear complaints of vision disturbance including

diplopia (double vision) and dry eyes.  Dr. Tesla recorded a prior

medical history (PHI) of "slow, painless progressive loss of VA (visual

acuity) in both eyes.  However, in Dr. Tesla's review of disease history,

there is no indication of Graves' disease being a part of the history.

Plaintiff's visual acuity at this point was noted to be 20/40 OD (right

eye) and 20/100 OS (left eye).

(h) Dr. Tesla's assessment was dry eye of bilateral lacrimal glands.

Treatment was with Restasis.  At no time did Dr. Tesla consider and/or

workup Plaintiff's eye complaints and visual disturbance for any other

etiology than dry eye.  Further, at no time did Dr. Tesla either consider

and/or workup the patient for eye symptoms secondary to the

previously diagnosed Graves' Disease.  Finally, at no time did Dr.

Tesla refer the patient to the ophthalmology service for work up of his

ocular symptoms.

(i) On or about August 1, 2018, Plaintiff was seen for his annual

examination at the VA Pittsburgh with Elaina Swan, DNP, CRNP with

the Primary Care Medicine Service.  At that time, Plaintiff made

continued complaints about his eyes and requested that he receive

Restasis for his eyes. However, although endocrinology at the VA

Pittsburgh had previously diagnosed the patient with Graves' Disease,

that diagnosis was not part of the assessment of the patient by Nurse

Swan on October 1, 2018.  Instead, the diagnosis was only "hyperthyroid, status post RAI ablation. On Synthroid now."  An additional assessment was "dry eyes, managed by optometry."  Although Graves' Disease is a form of hyperthyroidism that often manifests severe ocular symptoms, at no time did Nurse Swan consider or workup the Plaintiff for ocular symptoms secondary to Graves' Disease.  Furthermore, Nurse Swan did not refer Plaintiff to the ophthalmology service for evaluation of his ocular symptoms when she knew, or should have known, through the exercise of reasonable diligence that ocular symptoms in the presence of hyperthyroidism could be related to Graves' ophthalmopathy/orbitopathy which is appropriately managed by the ophthalmology service and not optometry.

(j) On or about October 16, 2018, Plaintiff was seen by Alexandra Clark, M.D., from the endocrinology service at the VA Pittsburgh.  The diagnosis again was Graves' Disease, status post ablation with resulting hypothyroidism and osteopenia.  Once again the clear diagnosis of Graves' Disease while noted in the endocrinology note by Dr. Clark was not transferred into the Plaintiff's list of diagnosis that would be seen in the EHR by other medical providers attending to him.  At the time of this visit with Dr. Clark, Plaintiff was complaining of dry eye for which he was taking Restasis and blurred vision.  At no point did Dr. Clark consider or work up the Plaintiff for ocular symptoms

8

secondary to Graves' Disease.  Further, at no point did Dr. Clark make a referral to ophthalmology for a workup of the symptoms of visual disturbance in light of the clear Graves' Disease diagnosis.

(k) On or about October 29, 2018, Plaintiff is seen by Monica Rechichar, O.D., at the VA optometry service.  At that time, the history of present illness continued to be "slow painless progressive decrease in visual acuity of both eyes."  Plaintiff continued to complain of dry eyes and, of note, his visual acuity testing had deteriorated dramatically to 20/70 +1 OD and 20/200+1 OS.  Dr. Rechichar noted that the prior visual acuity assessment of the right eye was 20/100.  However, Dr. Rechichar did not chart the prior medical history of hyperthyroidism converted to hypothyroidism after ablation nor did she chart the prior diagnosis of Graves' Disease.  Further, at no time did Dr. Rechichar consider or work up the patient up for Graves' Disease mediated ocular deterioration or dysfunction.  Finally, at no time did Dr. Rechichar refer Plaintiff to the ophthalmology service for evaluation of his ocular symptoms.

(l) On or about November 19, 2018, Plaintiff was seen by a podiatry attending, Diane Johnson.  This office note is remarkable in that Plaintiff is continuing to complain of visual impairment as a result of "chronic dry eyes".  Plaintiff self assessed his vision as "I can see outlines".  No referral made was by Dr. Johnson to ophthalmology regarding these symptoms.

(m) On or about November 30, 2018, Plaintiff is seen again by Dr. Tesla

with the optometry service.  The patient was complaining of blurry

vision that day.  Dr. Tesla attributed the complaint to dry eyes.  The

Plaintiff was apparently was receiving no relief from Restasis.  Dr.

Tesla again noted the history of "slow painless progressive loss of

visual acuity in both eyes."  Dr. Tesla's assessment was unchanged as

"dry eye of bilateral lacrimal glands."  Dr. Tesla only prescribed

continued Restasis and other artificial tears.  At no time did Dr. Tesla

consider or work the patient up for other etiologies for the patient's

ocular symptoms.  Also, at no time did Dr. Tesla acknowledge the prior

diagnosis of Graves' Disease.  Finally, Dr. Tesla did not refer Plaintiff

to ophthalmology for evaluation of his ocular symptoms.

(n) On or about December 3, 2018, Plaintiff was seen by Shannon

Hughes, R.N., of the Primary Care service at the VA of Pittsburgh.

Plaintiff once again made complaints about his visual dysfunction.

Nurse Hughes' note reflects that the patient:

> "[s]tates he is having a heck of a time with his eyes, both
> eyes have severe dry eye syndrome over the past of couple
> of months.  He has been to see eye clinic a couple of times.
> Saw Dr. Tesla last week at UD; not getting much
> improvement…states he is to the point he cannot see well."

In spite of the fact that Graves' Disease was diagnosed in 2017 and

also that the patient was now hypothyroid after the previous ablation

procedure, Nurse Hughes' prior medical history sets forth that the

patient was "hyperthyroidism."  At no time did Nurse Hughes refer

Plaintiff to ophthalmology for assessment.  At no time did Nurse Hughes

consider or work the patient up for visual disturbance secondary to the

prior diagnosis of Graves' Disease.

(o) On or about December 11, 2018, Nurse Hughes added an addendum

to the chart indicating that the patient "is very concerned about his eye

condition."  At no time did Nurse Hughes either consider or work up the

patient for visual disturbance secondary to the prior diagnosis of

Graves' Disease or refer Plaintiff to the ophthalmology service.

(p) On or about February 1, 2019, Plaintiff was seen again by Dr. Tesla of

the optometry service.  Dr. Tesla recorded that the patient continued to

complain of blurry vision "due to dry eye."  The history of present

illness continued to be documented as "slow painless progressive loss

of visual acuity of both eyes."  Remarkably, the assessment of visual

acuities was 20/200 in the right eye (OS) but there had been a

dramatic deterioration in visual acuity in the left eye (OD) to 20/400.

Dr. Tesla continued to diagnose the patient with dry eyes of the

bilateral lacrimal glands and continued to prescribe Restasis and

added a steroid.  At no time did Dr. Tesla consider another etiology for

the patient's complaints of visual disturbance and at no time did Dr.

Tesla consider or work the patient up for visual disturbance secondary

to the previous diagnosis of Graves' Disease.  Finally, Dr. Tesla did not

refer Plaintiff to the ophthalmology service for evaluation.

(q) On or about February 15, 2019, Plaintiff was seen again by Dr. Tesla. The complaints, history of present illness and Dr. Tesla's assessment were the same as in the February 1, 2019, assessment.  Again, Dr. Tesla did not consider or work the patient up for any other etiology for his visual disturbance beyond dry eye of the bilateral lacrimal glands. At no time did Dr. Tesla either consider that the patient's symptoms of visual disturbance were secondary to Graves' Disease or refer Plaintiff to the ophthalmology service for evaluation.

(r) On or about April 8, 2019, Plaintiff was seen again by Dr. Subramaniam of the endocrinology service.  Current complaints were dry eye, intermittent significant blurring of vision, prior double vision, redness of eyes, increased swelling of eyelids, redness of eyelids.  Dr. Subramaniam reviewed the recent assessment made by optometrist, Dr. Tesla.  The endocrinology assessment was in follow up of Graves' Disease status post ablation with resulting hypothyroidism. Additionally, an assessment of "possible Graves' orbitopathy" was also made.  Further, Dr. Subramaniam set out the revelation that "patient is being seen by optometry and not ophthalmology."  Consequently, Dr. Subramaniam requested an ophthalmology consult and early evaluation for the Plaintiff's ocular complaints.  An MRI was also ordered but because of equipment problems, a CT study was ordered instead.  The CT study was "consistent with thyroid associated orbitopathy in this patient with reported Graves."

(s) On or about April 18, 2019, Plaintiff was finally seen by the ophthalmology service at the VA Pittsburgh.  On that date, he was seen by an ophthalmology attending, Seshaiyengar Venkatesh.  Dr. Venkatesh relayed the significant events of the Plaintiff's medical history.  Specifically, that the Plaintiff was diagnosed with Graves' Disease in October of 2017.  Ablation of the thyroid was done that same month.  In September of 2018, visual acuity was 20/40 in both eyes (as per VA records).  An about that time, the patient began to complain of dry eye symptoms and diplopia.  Dr. Venkatesh reviewed the CT scan and his assessment was "Graves' orbitopathy with optic neuropathy (decrease in acuity from 20/40 in  September of 2018 to 20/200 in the right eye (OS) and to CF in the left eye (OD)[1]."  Dr. Venkatesh also noted significant exophthalmos (eye bulging).  Finally, Dr. Venkatesh described Plaintiff's condition as "severe vision threatening disease."

(t) As a plan of treatment, Plaintiff was to be admitted as an inpatient to the VA Pittsburgh for IV steroids, a consultation for the surgery for thyroidectomy and if no significant improvement, a referral to ophthalmological surgery for an urgent orbital decompression at UPMC.

(u) Unfortunately, Plaintiff's vision did not improve with medical treatment and he was referred to Tonya Stefko, M.D., an ophthalmological

---

[1] "CF" is an abbreviation for "counting fingers" and is a frequently used ophthalmological term to define visual acuity less than 20/400. It is an indication of very low visual acuity.

surgeon at UPMC for a surgical consultation.  On or about May 1, 2019, Plaintiff underwent a bilateral orbit decompression by Dr. Stefko at UPMC.  Concurrent with that procedure, Plaintiff also underwent endoscopic medial orbital and optic canal decompressions performed by Carl Snyderman, M.D.

(v) Unfortunately, the surgical procedures did not restore Plaintiff's vision and he remains with severe vision loss bilaterally.  This condition is likely permanent.

(w) Had the attending medical providers at the VA of Pittsburgh timely diagnosed the Plaintiff's visual disturbance secondary to Graves' Disease, it is likely that appropriate and timely medical and/or surgical treatment would have been provided and Plaintiff's current severe vision loss could have been avoided.

(x) The failure of the providers at the VA of Pittsburgh to timely diagnose and appropriately treat Plaintiff's visual disturbance secondary to Graves' Disease significantly increased the risk that Plaintiff would sustain permanent severe vision loss.

## COUNT I - NEGLIGENCE

## JOHN GAZDACKO VS.  UNITED STATES OF AMERICA

11.    Paragraphs 1 through 10 of this Complaint are incorporated by reference as though more fully set forth herein.

14

12.     Plaintiff's injuries were the direct and proximate result of the negligence of the Defendant, United States of America, individually, and/or acting through its agents, servants, employees, physicians, nursing staff, technicians, emergency room personnel and/or physicians it held out to Plaintiff as employees, agents or servants, either through its acts or in the failure to act in some manner which led Plaintiff to believe that he was being treated by this Defendant and/or one of its agents, servants or employees, including, including, *inter alia,* Monica Rechichar, O.D., Elaina Swan, DNP, CRNP, Shannon Hughes, R.N., Nicholas Tesla, O.D., Shreya Subramaniam, M.D., Alexandra Clark, M.D. and multiple other physicians, CRNP's and other RN's at the VA Pittsburgh, by providing medical care that fell below or deviated from accepted standards of medical care generally or as more particularly set forth below[2]:

(a)     In failing to properly collect, interpret, and evaluate Plaintiff's history of symptoms, complaints, diagnostic test results, previous treatment and other available information;

(b)     In failing to know and/or utilize accepted and proper principles of history – taking in the care and treatment provided to Plaintiff;

(c)     In failing to exercise reasonable care and judgment in evaluating Plaintiff's medical history;

(d)     In failing to order timely and proper diagnostic and diagnostic imaging tests of Plaintiff;

(e)     In failing to properly collect, interpret and evaluate the results of the diagnostic tests performed of Plaintiff reviewed by this Defendant and

---

[2] See, Certificate of Merit pursuant to Pennsylvania Rule of Civil Procedure 1042.3 attached as Exhibit "C".

its agents, servants, employees, deemed federal employees and ostensible agents;

(f)     In failing to coordinate Plaintiff's care among the multiple medical specialties at the VA of Pittsburgh/VA Heinz including, *inter alia,* primary care medicine, endocrinology, optometry and ophthalmology;

(g)     In the failure of Dr. Subramaniam, Dr. Clark and all other providers from the endocrinology service attending to Plaintiff to ensure that Plaintiff's other providers in primary care medicine, optometry and ophthalmology were aware of Plaintiff's diagnosis of Graves' Disease;

(h)     In the failure of Dr. Subramaniam, Dr. Clark and the remaining providers from the endocrinology service to either work up the patient and/or to immediately refer Plaintiff to the ophthalmology service when complaining of visual disturbance and eye dysfunction in light of his diagnosis of Graves' Disease;

(i)     In the failure of Dr. Subramaniam, Dr. Clark and the other providers from the endocrinology service to know that Plaintiff was not treating with ophthalmology in light of his diagnosis of Graves' Disease and complaints of visual disturbance and eye dysfunction;

(j)     In the failure of Dr. Tesla, Dr. Rechichar and other providers from the optometry service to either timely suspect or diagnose Plaintiff's visual dysfunction and eye disturbance secondary to Graves' Disease;

(k)     In failure of Dr. Rechichar, Dr. Tesla and the providers from the optometry service to be aware of Plaintiff's diagnosis of Graves' Disease and the implications of that diagnosis on complaints of visual disturbance and eye dysfunction;

(l)     In the failure of Dr. Rechichar, Dr. Tesla and other providers from the optometry service from the VA of Pittsburgh to promptly refer Plaintiff to the ophthalmology service in light of his continuing complaints of visual disturbance and eye dysfunction;

(m)     In the failure of Nurse Swan and Nurse Hughes other providers from the primary care service from the VA of Pittsburgh to either timely suspect or diagnose Plaintiff's visual dysfunction and eye disturbance secondary to Graves' Disease;

(n)     In failure of Nurse Swan, Nurse Hughes and the providers from the primary care service to be aware of Plaintiff's prior diagnosis of Graves' Disease and the implications of that diagnosis on complaints of visual disturbance and eye dysfunction;

(o)     In the failure of Nurse Swan, Nurse Hughes and other providers from the primary care service from the VA of Pittsburgh to either work up and/or to promptly referral Plaintiff to the ophthalmology service in light of his visual disturbance and eye dysfunction;

(p)     In the systemic failure of the VA of Pittsburgh to coordinate the charting of Plaintiff's medical history, complaints, diagnosis, treatments in the EHR so that the providers from other medical

services including primary care medicine and optometry were aware of Plaintiff's endocrinology service diagnosis of Graves' Disease beginning in 2017;

(q)     In failing to select, purchase, implement and maintain an appropriately functioning and integrated EHR system that would allow the diagnosis of Graves' Disease by the endocrinology service to appear in the system-wide EHR of Plaintiff so that other medical providers were appropriately notified of that diagnosis, including from primary care medicine and optometry;

(r)     In allowing Nurse Swan, Nurse Hughes, Dr. Rechichar, Dr. Tesla and other providers from the primary care medicine and optometry service to attend to Plaintiff's ocular symptoms generally and specifically when they were not appropriately educated, trained and experienced in the diagnosis and management of visual disturbance and eye dysfunction secondary to Graves' Disease;

(s)     In failing to develop and implement an appropriate treatment plan for Plaintiff given his prior diagnosis of Graves' Disease and in light of his complaints of visual disturbance of eye dysfunction;

(t)     In allowing Plaintiff to be treated by Dr. Rechichar, Dr. Tesla, Nurse Swan and Nurse Hughes when they were not appropriately knowledgeable in regard to the relevant medical literature concerning the Graves' Disease and the complications thereto, including, *inter alia,* Graves' orbitopathy;

(u)     Deviating from the corporate standard of care for hospitals in the
Commonwealth of Pennsylvania as defined by _Thompson vs._
_Nason Hospital,_ 591 A.2d 703 (Pa 1991) including, *inter alia,* failing
to select and retain only competent physicians and other personnel;
failing to oversee all persons who practice medicine and provide
patient care within its walls; failing to formulate adopt and enforce
adequate rules and policies to ensure quality care for patients; and
failing to provide and maintain safe and adequate facilities and
equipment.

(v)     Failure to exercise the due care and caution required under the
circumstances.

13.     As a direct and proximate result of the aforesaid negligence of Defendant
United States of America, Plaintiff's decedent was caused to sustain the following injuries,
some or all of which or may be permanent:

(a)     Severe Graves' orbitopathy with optic neuropathy;

(b)     Significant exophthalmos and PEE;

(c)     Severe eye motility restriction with a history of diplopia;

(d)     Severe vision threatening disease;

(e)     Severe loss of visual acuity bilaterally;

(f)     Blindness in one or both eyes.

(g)     Other painful, debilitating and permanent injuries.

14.     Solely as a result of the aforesaid injuries, Plaintiff, John Gazdacko,
sustained the following damages all of which are or may be of a permanent nature:

(a) he has suffered and will continue to suffer great pain, suffering, inconvenience, embarrassment, humiliation and mental anguish;

(b) he has been, and will continue to be, required to expend large sums of money for surgical and medical attention, hospitalization, medical supplies, surgical appliances, medicines, rehabilitative and attendant services, including, past medical expenses not covered by VA benefits or insurance;

(c) he has been disfigured;

(d) his general health, strength and vitality has been impaired;

(e) he has sustained severe vision loss and is blind in one or both eyes;

(f) he has been unable to enjoy the ordinary pleasures of life;

(g) he has sustained the loss of the ability to engage in the normal and customary activities of daily living;

(h) as a result of his injuries, Plaintiff may have sustained a permanent diminution of the ability to enjoy life and life's pleasures;

WHEREFORE, based upon the foregoing, Plaintiff, John Gazdacko, respectfully demands that this Honorable Court enter judgment in his favor and against the Defendant, United States of America, in the sum of $2,000,000.00, plus prejudgment interest, attorney's fees and costs expended in this action and for such other relief as the court deems necessary and just.

Respectfully Submitted,


LAW OFFICE OF MICHAEL C. GEORGE

By:   /s/ Michael C. George
Michael C. George, Esquire
Attorney for Plaintiffs
Law Office of Michael C. George
330 Grant Street, Suite 712 Grant Building
Pittsburgh, PA  15219
Phone:  (412)-566-2299
Fax:  (412) 471-2120
Email:  mgeorge@mikegeorgelaw.com
Pa ID:  43662